**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| KnightBrook Insurance Company and Knight Management Insurance Services, LLC, | No. CV-12-01671-PHX-DGC |
| Plaintiffs, | **ORDER** |
| v. | |
| Payless Car Rental System, Inc.; PCR Venture of Phoenix, LLC; ABC Corporations I-X; XYZ Partnerships I-X; and John and Jane Does I-X, | |
| Defendants. | |

Defendants Payless Car Rental System, Inc. ("Payless") and PCR Venture of Phoenix, LLC ("PCR") (collectively, the "Payless entities") have filed a motion for summary judgment (Doc. 193), as have Plaintiffs KnightBrook Insurance Company ("KnightBrook") and Knight Management Insurance Services, LLC (collectively, the "Knight entities") (Doc. 232). The motions are fully briefed. The Court will grant the Payless entities' motion in part and deny it in part.[1] The Court will deny the Knight entities' motion.

The Payless entities have filed a motion in limine to exclude the testimony of Plaintiffs' expert Thomas Zlaket. Doc. 242. Defendants have filed a motion for leave to

---

[1] The requests for oral argument are denied because the issues have been fully briefed and oral argument will not aid the Court's decision. *See* Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

file a surreply.  Doc. 253.  Plaintiffs have filed a motion requesting that the Court adopt negative inferences.  Doc. 227.  Defendants have filed a motion for jury trial.  Doc. 256. The Court will deny these motions.

## I.     Motions for Summary Judgment.

### A.     Background.

On February 17, 2010, Michael Bovre rented a vehicle from Payless.  Doc. 116, ¶ 8.  The rental agreement stated: "___ BY INITIALING HERE, YOU DECLINE TO PURCHASE SUPPLEMENTAL LIABILITY INSURANCE AND YOU AGREE TO BE PRIMARILY RESPONSIBLE FOR ALL DAMAGE OR INJURY YOU CAUSE TO OTHERS OR THEIR PROPERTY."  *Id.*, ¶ 10.  Bovre did not initial on the line next to this statement.  *Id.*, ¶ 12.  Bovre believed that Dennis Fisher, the Payless desk agent, had advised him that the rental agreement provided Supplemental Liability Insurance ("SLI") coverage.  *Id.*, ¶ 13.  Bovre did not pay for SLI coverage.  On March 1, 2010, Bovre was driving the rental car when he collided with a motorcycle driven by Robert and Lorraine McGill.  The McGills sustained significant and permanent injuries.  *Id.*, ¶ 15.

The McGills commenced an action against Bovre on February 8, 2011.  *Id.*, ¶ 16. On the same day, the McGills submitted a settlement demand to Bovre for $1,500,000. *Id.*, ¶ 17.  The demand was for an amount within the total available liability limits and protection afforded by the following: (1) Bovre's personal liability insurance limit of $500,000 provided by Travelers Insurance Company ("Travelers"), (2) SLI coverage of $1,000,000 provided by Sonoran National Insurance Group, National Specialty and/or KnightBrook, and (3) Payless' mandatory rental car coverage of $30,000 pursuant to A.R.S. § 28-2166.  *Id.*  In response to the settlement demand, Travelers and Payless agreed to make $530,000 immediately available in exchange for a full and final release of all claims against Bovre and a dismissal of the lawsuit.  *Id.*, ¶ 18.  Sonoran, National Specialty, KnightBrook, and Payless denied SLI coverage to Bovre and denied any responsibility to defend or indemnify him in the McGills' lawsuit.  *Id.*, 19.  The McGills declined to provide a full and final release of all claims in exchange for $530,000.

Bovre sought to protect his interests by entering into a settlement agreement with the McGills. *Id.*, ¶ 21. The McGills agreed to limit their claims against Bovre by entering into a *Damron* agreement in exchange for the $530,000 payment from Travelers and Payless and an assignment of any and all rights Bovre had against the SLI insurers under Arizona law. *Id.*; *see Damron v. Sledge,* 460 P.2d 997 (Ariz. 1969). In connection with the *Damron* agreement, the parties entered into an $8 million stipulated judgment. Doc. 116, ¶ 22.

On June 28, 2012, the McGills filed an action in state court against, among others, the Knight entities and the Payless entities. Doc. 40. The McGills asserted Bovre-assigned claims for breach of the insurance contract and bad faith against the Knight entities. Doc. 1-2 at 40-42. They also asserted Bovre-assigned claims for negligence against the Payless entities. *Id.* at 40-41. On August 6, 2012, the action was removed to this Court on the basis of diversity jurisdiction.

On March 14, 2013, the McGills sent a time-limited settlement demand for $1 million to the Payless and Knight entities that would resolve all claims. The settlement demand was set to expire on March 29, 2013. Doc. 116, ¶ 24. Upon request by the Knight entities, the McGills reduced their demand to $970,000. *Id.*, ¶ 25. The Knight entities requested that the Payless entities contribute to the settlement, but the Payless entities refused. *Id.*, ¶ 26. As a result, the Knight entities funded the $970,000 settlement on their own. *Id.*, ¶ 27. The settlement agreement assigned all of the Bovre claims to the Knight entities, including Bovre claims against the Payless entities. *Id.*, ¶ 28.

As a result of the Knight entities' settlement and assignment agreement, the parties in this case have been reshuffled. The Knight entities, which formerly were defendants, are now the plaintiffs, and will be referred to in the remainder of this order as "Plaintiffs." On June 14, 2013, Plaintiffs filed a complaint asserting two types of claims against the Payless entities, who will be referred to in the remainder of this order as "Defendants": (1) Bovre's assigned claims for breach of contract, breach of oral contract, negligent misrepresentation, and negligence; and (2) Plaintiffs' own claims for equitable

indemnification and breach of fiduciary duty.  *Id.*, ¶ 30-76.  Defendants filed an answer on July 1, 2013.  Doc. 116.  Defendants later filed an amended answer asserting a counterclaim for bad faith against Plaintiffs.  Doc. 144, ¶¶ 22-26.

### B.    Legal Standard.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### C.    Analysis.

#### 1.    Assigned Negligence Claims.

In counts one and two of their complaint, Plaintiffs assert claims for negligence and negligent misrepresentation that originally belonged to Bovre.  Doc. 116, ¶¶ 30-35, 36-42.  The negligence claim arises from Payless desk agent Dennis Fisher's failure to complete Bovre's paperwork carefully.  *Id.*, ¶ 32.  The negligent misrepresentation claim arises from Fisher's alleged misrepresentation that SLI was included in the car rental notwithstanding Bovre's failure to pay for it.  *Id.*, ¶ 37-39.  Because Plaintiffs obtained the negligence claims through an assignment from Bovre, they must stand in Bovre's shoes.  *See K.B. v. State Farm Fire & Cas. Co.*, 941 P.2d 1288, 1292 (Ariz. Ct. App. 1997) (quoting *Stephens v. Textron, Inc.*, 619 P.2d 736, 739 (Ariz. 1980)) (Assignee "'can stand in no better position than the assignor and an assignment cannot alter the defenses or equities of the third party.'").  Defendants argue that both claims are barred by the statute of limitations.  Doc. 193 at 5.  The Court agrees.

- 4 -

1    In Arizona, tort claims sounding in negligence are subject to a two-year limitations
2    period.  *See* A.R.S. § 12-542(3); *ELM Ret. Ctr., LP v. Callaway*, 246 P.3d 938, 941 (Ariz.
3    Ct. App. 2010).  Arizona's "discovery rule" tolls the limitations period "until the plaintiff
4    possesses a minimum knowledge sufficient to recognize that a 'wrong occurred and
5    caused injury.'"  *Ritchie v. Krasner*, 211 P.3d 1272, 1288 (Ariz. Ct. App. 2009) (quoting
6    *Walk v. Ring*, 44 P.3d 990, 996 (Ariz. 2002)).  "The discovery rule, however, does not
7    permit a party to hide behind its ignorance when reasonable investigation would have
8    alerted it to the claim."  *Callaway*, 246 P.3d at 941.  Instead, a tort claim accrues when a
9    plaintiff knows or "with reasonable diligence should know" of the defendant's wrongful
10   conduct.  *Doe v. Roe*, 955 P.2d 951, 960 (Ariz. 1998).

11          Defendants argue that Bovre knew or should have known of Fisher's allegedly
12   wrongful conduct on April 19, 2010, when Bovre admitted in a recorded statement that
13   he "evidently [did] not" purchase SLI from Payless.  Doc. 193 at 6; Doc. 194 at 5.
14   Although he claimed the SLI was given to him for free, Bovre admitted there was
15   "nothing [in the Rental Contract] to indicate that."  Doc. 193 at 6; Doc. 194 at 5-7.
16   Defendants also argue that Bovre knew or should have known of the allegedly wrongful
17   conduct in May 2010 when he was actively investigating his claims and the issues
18   surrounding SLI.  As part of Bovre's investigation, he engaged an attorney, Jefferson
19   Collins.  Doc. 193 at 7; Doc. 194-8 at 2-4; Doc. 194-9 at 1.  Subsequently, Collins sent
20   two letters, one to Bovre on June 22, 2010 confirming his representation (Doc. 194-9
21   at 1), and another to Payless on June 24, 2010 demanding payment on the SLI policy
22   (Doc. 194-10 at 1-4).  Defendants argue that the negligence claims accrued, at the very
23   latest, on June 24, 2010, when it is clear from Bovre's attorney's letter that Bovre knew
24   or should have known of the alleged wrong.  Doc. 193 at 7.  Because the initial complaint
25   was not filed until more than two years later, June 28, 2012, Defendants argue the
26   negligence claims are time-barred.  *Id*.; Doc. 1-2 at 36.

27
28

1    Plaintiffs argue that the negligence claims did not accrue until after July 1, 2010,

2  when Knight Management Insurance Services, LLC ("KMIS") sent a letter denying SLI

3  coverage.  Doc. 223 at 3.  Plaintiffs assert that the negligence claims could not have

4  accrued before that date because "any question regarding whether [Bovre] had SLI

5  coverage was unresolved; consequently, any claim that he had relating to Payless'

6  negligence would have been mere supposition before July 1, 2010."  *Id.*  Bovre's

7  August 23, 2010 affidavit states that he did not know SLI coverage would not be

8  provided until after he received the July 1, 2010 letter from KMIS.  *Id.* at 5; Doc. 224-2 at

9  27.  Because the parties dispute the date Bovre discovered his alleged harm, Plaintiffs

10  argue that the issue cannot be resolved on summary judgment.  Doc. 223 at 3; *see*

11  *Logerquist v. Danforth*, 932 P.2d 281, 287-88 (Ariz. Ct. App. 1996) ("Application of the

12  discovery rule often depends on resolution of . . . factual issues, and this court's function

13  is not to resolve disputed facts.").

14    Plaintiffs' emphasis on the July 1, 2010 letter is misplaced.  The relevant date is

15  not when Bovre had written confirmation from KMIS that he lacked SLI coverage, but

16  when a reasonable person in Bovre's position would have been on notice to investigate a

17  claim for negligence.  *Walk*, 44 P.3d at 996.  The negligence claims accrued when Bovre

18  was aware that Fisher had engaged in negligent acts or had made negligent

19  misrepresentations.  It is clear from the record that Bovre knew Fisher failed to "carefully

20  complete" the rental agreement or made misrepresentations regarding the rental contract

21  before June 24, 2010.  Bovre's decision to investigate these facts and hire an attorney

22  shows his awareness of their potential legal significance.  The Court concludes that the

23  claims for negligence and negligent misrepresentation accrued on or before June 24, 2010

24  and are time-barred.  The Court will enter summary judgment on counts one and two.[2]

25

26

27

28    [2] The Court is also satisfied that Bovre had suffered injury by this date.  He had
incurred liability to the McGills, and had been forced to hire counsel to pursue SLI.

## 2.     Assigned Breach of Contract Claims.

In counts three and four, Plaintiffs assert breach of contract claims that were assigned from Bovre.  Doc. 116, ¶¶ 43-48, 50-56.  Plaintiffs argue that Bovre's written rental contract included SLI coverage.  Doc. 116, ¶¶ 52-54.  In the alternative, Plaintiffs argue that Bovre was orally promised SLI coverage and that this promise constitutes an enforceable contract.  *Id.*, ¶¶ 45-46.  Defendants argue that Plaintiffs' assigned breach of contract claims fail as a matter of law for two reasons: (1) SLI was not included in any contract between Bovre and Payless, and (2) the breach of contract claims are barred by the doctrine of accord and satisfaction.  Doc. 193 at 8, 12.

### a.     Contract Interpretation.

In a breach of contract claim, "the plaintiff has the burden of proving the existence of a contract, breach of the contract, and resulting damages."  *Chartone, Inv. v. Bernini*, 83 P.3d 1103, 1111 (Ariz. Ct. App. 2004).  The interpretation of a contract is a question of law, *Taylor v. State Farm Mutual Automobile Insurance Company*, 854 P.2d 1134, 1138 (Ariz. 1993) (en banc), that is not limited to the words set forth in the document, *Darner Motor Sales, Inc. v. Universal Underwriters Insurance Company*, 682 P.2d 388, 398 (Ariz. 194) (en banc).  In Arizona, contract interpretation follows a two-step process. First, the Court must consider "the evidence that is alleged to determine the extent of integration, illuminate the meaning of the contract language, or demonstrate the parties' intent."  *Taylor*, 854 P.2d at 1139.  The Court must "apply a standard of reasonableness to contract language" and construe the contract "in its entirety and in such a way that every part is given effect."  *Goddard v. R.J. Reynolds Tobacco Co.*, 75 P.3d 1075, 1078 (Ariz. Ct. App. 2003) (internal quotation marks and citations omitted).  The Court must consider any relevant extrinsic evidence and, if "the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties."  *Taylor*, 854 P.2d at 1140 (citation omitted).  Second, the Court must "finalize" its understanding of the contract.  *Id.* at 1139.

i.      **Written Contract.**

Defendants do not dispute the existence of a contract with Bovre, but they contend that SLI coverage was not included in the contract.  Doc. 193 at 8.  Plaintiffs assert that SLI was included in the rental agreement because Bovre did not initial on the line to decline SLI coverage.  Doc. 116, ¶¶ 52-55.  Defendants rejoin that Bovre's rental contract unambiguously does not include SLI because "SLI is clearly not listed in the charge summary, and Bovre admittedly did not pay for SLI coverage."  Doc. 193 at 8; Doc. 194-1 at 1; Doc. 194-7 at 4.

The Court disagrees with Defendants.  Although the charge summary suggests that Bovre did not procure SLI, his failure to initial on the line next to the statement indicating that he declined SLI suggests that he did in fact procure it.  Doc. 194-1 at 1.  Because the contract is "reasonably susceptible" to Plaintiffs' interpretation that "Bovre intended to accept the SLI coverage that had been offered to him because he did not decline it" (Doc. 227 at 6-7), parol evidence must be admitted to "determine the meaning intended by the parties" and clarify ambiguity on the face of the contract.  *Taylor*, 854 P.2d at 1140 (citation omitted).  When asked why he failed to initial next to the space declining SLI, Bovre testified: "since [Fisher] had already told me they were going to include liability, I didn't initial to decline the liability."  Doc. 224-1 at 23-24, 28.  The lack of initials on the contract corroborates Bovre's understanding that SLI was included.

The credibility of Bovre's account must be assessed at trial.  Because a genuine issue of material fact exists regarding whether the rental agreement included SLI, the Court concludes that it cannot determine the meaning of the contract as a matter of summary judgment.  Doc. 86 at 13.

ii.      **Oral Contract.**

Defendants dispute the existence of an oral contract.  Doc. 193 at 10; Doc. 237 at 8.  "For an enforceable contract to exist, there must be an offer, an acceptance, consideration, and sufficient specification of terms so that the obligations involved can be ascertained."  *K-Line Builders, Inc. v. First Fed. Sav. & Loan Ass'n*, 677 P.2d 1317, 1320

(Ariz. Ct. App. 1983).   To establish that an oral contract existed, Plaintiffs assert the following facts: during the rental car transaction on February 17, 2010, Fisher offered Bovre SLI as part of the rental agreement and Bovre accepted Fisher's offer by renting a vehicle from Payless instead of from another rental car business.  Doc. 116, ¶¶ 45-47.

Defendants argue that these facts do not evince a "sufficient mutual understanding as to all the terms of the contract."  Doc. 237 at 8 (quoting *Savoca Masonry Co., Inc. v. Homes & Son Constr. Co., Inc.*, 542 P.2d 817, 920 (Ariz. 1975)).  Defendants indicate that neither Bovre nor Fisher testified that SLI was mentioned during the conversation. Instead, Bovre testified that he was offered "liability insurance," which Defendants argue is vague because "liability insurance" could represent any number of insurance products, including the $30,000 liability insurance policy from Great American Assurance Company ("Great American") that Defendants obtained for Bovre.   Doc. 237 at 8. Because the term "liability insurance" is arguably vague, Defendants assert that no oral contract to procure SLI was formed as a matter of law.  *Id.*

The Court cannot agree.  If the finder of fact finds credible Bovre's testimony that Fisher offered to include "liability insurance" in the rental contract, and that Bovre interpreted this to mean SLI, the finder of fact might conclude that there was sufficient specification of terms.   Doc. 224-1 at 23, 28-29, 31.   Bovre's belief that "liability insurance" meant SLI is an arguably plausible interpretation of the parties' agreement. This is so because Fisher circled the blank line upon which Bovre would need to initial to decline SLI and then permitted Bovre to rent the vehicle without initialing the line.  The Court cannot at this stage conclude that no oral contract was formed as a matter of law.

### b.      Accord and Satisfaction.

"The doctrine of accord and satisfaction discharges a contractual obligation or cause of action when the parties agree to exchange something of value in resolution of a claim or demand and then perform on that agreement, the 'accord' being the agreement, and the 'satisfaction' its execution or performance."  *Best Choice Fund, LLC v. Low & Childers, P.C.*, 269 P.3d 678, 686 (Ariz. Ct. App. 2011) (internal quotation marks and

citation omitted).  "Like any contract, an accord must have (1) an appropriate subject for agreement, (2) parties competent to enter in the agreement, (3) consideration, and (4) a meeting of the minds between the parties."  *Id*.  Defendants argue that the McGills, to whom Bovre first assigned his contract claims, entered into a settlement agreement with Plaintiffs in which they were paid the full amount due under the SLI policy.  Doc. 193 at 12.  The settlement agreement constituted an accord, they argue, and Plaintiffs' payment under the agreement constituted a satisfaction that extinguished the contract claims assigned by Bovre.  *Id*.

Plaintiffs argue that Defendants "confuse[] the distinct claims that were at issue and the law relating to accord and satisfaction."  Doc. 223 at 10.  Plaintiffs assert that the McGills prosecuted Bovre-assigned claims for breach of contract against both Plaintiffs and Defendants and that claims against Defendants related to breach of the rental agreement while claims against Plaintiffs related to breach of an insurance contract.  Doc. 223 at 10.  Because "distinct claims for distinct contractual breaches were asserted," Plaintiffs argue, accord and satisfaction do not apply to the settlement agreement.  *Id*.

The Court disagrees.  The McGills' first amended complaint refers to the contract at issue as "an insurance contract" (Doc. 40, ¶ 9) and "the insurance contract" (*id.*, ¶ 15).  The complaint then alleges in a single paragraph that Plaintiffs and Defendants are liable for "breach of contract."  *Id.*, ¶ 25.  From these allegations, the Court concludes that the McGills sued on a single contract, referred to in the complaint as the insurance contract.  Nowhere in the first amended complaint did the McGills prosecute a distinct claim against Defendants for breach of the rental agreement.

The settlement agreement with the McGills was therefore an "accord," and payment of the amount required under the agreement was a "satisfaction" – it discharged the contractual obligation under the insurance agreement at issue in the McGills' first amended complaint by providing something of value in lieu of the obligation.  The Court therefore concludes that the McGills' breach of contract claim was extinguished by an accord and satisfaction and could not be assigned to Plaintiffs for further assertion against

Defendants.  The Court will enter summary judgment on counts three and four.

### 3.        Equitable Indemnification.

In count five, Plaintiffs assert a claim for equitable indemnification.  Doc. 116, ¶¶ 57-68.  Plaintiffs argue that Fisher's failure to review the rental agreement properly, and his representations to Bovre regarding SLI coverage, caused Bovre to "walk away from the rental counter believing that he had SLI coverage" when he clearly did not because Bovre failed to pay the premium due and the SLI policy expressly provides that "failure to decline coverage is not evidence of coverage."  *Id*., ¶¶ 60-63.  As a result of Fisher's negligence, Plaintiffs were forced to oppose the McGills and pay $970,000, which Plaintiffs assert Defendants should have paid.  *Id*., ¶¶ 66-67.  Plaintiffs argue that they are entitled by principles of equitable indemnification to reimbursement of the $970,000 paid to the McGills and Plaintiffs' attorneys' fees incurred in responding to the claims.  *Id*., ¶ 68.

Defendants argue that Plaintiffs' equitable indemnification claim fails as a matter of law for two reasons: (1) the claim is precluded by Arizona's anti-subrogation rules; and (2) Plaintiffs failed to procure a release of Bovre's claims for Defendants.  Doc. 193 at 13, 15.

### a.        Anti-Subrogation Rule.

The anti-subrogation rule is a common law doctrine "intended to prevent an insurer from recovering back from its insured that loss or damage the risk of which the insured had passed along to the insurer under the policy."   16 G. Couch, Couch on Insurance §§ 224:1 & 224:3 (3d ed. 2005).  Under the anti-subrogation rule, an insurer that pays money on a covered claim cannot attempt to recover that money from its insured, even if the insured's negligence caused the loss.  *See Consol. Enters., Inc. v. Schwindt*, 833 P.2d 706, 710 (Ariz. 1992) (en banc) ("General principles of insurance law prevent a casualty insurer from seeking indemnification from its insured."); *Indus. Indem. Co. v. Beeson*, 647 P.2d 634, 638 (Ariz. Ct. App. 1982) ("No right of subrogation can arise in favor of an insurer against its own insured . . . . To allow subrogation under such

circumstances would permit an insurer, in effect, to pass the incidence of the loss, either partially or totally, from itself to its own insured and thus avoid the coverage which its insured purchased.").   The anti-subrogation rule applies to contractual and equitable claims.  16 G. Couch, Couch on Insurance § 224:4 (3d ed. 2005).

Plaintiffs make two arguments in response to Defendants' assertion that the claim for equitable indemnification is foreclosed by the anti-subrogation rule: (1) Defendants were not insureds under the master SLI policy, and (2) Plaintiffs assert the claim for equitable indemnification in their capacity as Defendants' principal, not as Defendants' insurer.  Doc. 232 at 2; Doc. 223 at 11.  The Court will address the first argument in this section and the second argument in section I(C)(3)(c) below.

Plaintiffs assert that the SLI master policy was a "counter product" that PCR sold to its customers and not a "source of protection and security" for PCR.  Doc. 232 at 8.  To support their assertion, Plaintiffs argue that PCR "never paid *any* premium to KnightBrook for coverage for itself" and that "no coverage could have existed" because PCR was insured under a different policy issued by Great American.  Doc. 232 at 6-7 (emphasis in original).  The Court disagrees.  The master policy repeatedly refers to PCR as "NAMED INSURED" or "the insured" and commits KnightBrook Insurance Company to cover all sums for which "the insured" becomes liable as a result of bodily harm or property damage caused by an "occurrence and arising out of the ownership, maintenance, [etc.] of an owned automobile[.]"  Doc. 194-17 at 1-3.  In addition, the master policy includes a formula used to determine the premium owed each policy period (Doc. 194-17 at 7-8), and Plaintiffs do not assert that PCR failed to pay the premium at the end of any policy period.  As a result, Plaintiffs' contention that Defendants were not insureds covered by the SLI policy lacks merit.  Under Arizona's anti-subrogation rules, therefore, Plaintiffs – in their capacity as the insurer – may not assert an equitable right of subrogation against Defendants – in their capacity as the insured – for the McGills' breach of insurance contract and bad faith claims arising out of the SLI policy.

1    The Court's conclusion that Defendants are insureds under the master policy does

2    not, however, dispose of Plaintiffs' claim for equitable indemnification.  As the Court

3    will explain below, Defendants wear two hats in this case – they are Plaintiffs' insureds,

4    but they may also be Plaintiffs' agents.   While the Court concludes that the anti-

5    subrogation rule precludes Plaintiffs' claim for equitable subrogation in their capacity as

6    Defendants' insurer, the anti-subrogation rule does not apply in the principal-agent

7    context.  In section I(C)(3)(c) below, the Court will consider whether Plaintiffs' claim for

8    equitable subrogation may be asserted against PCR in its capacity as Plaintiffs' agent.

9                        **b.      Failure to Procure a Release for Defendants.**

10    Defendants argue that Plaintiffs' claim for equitable indemnification fails as a

11    matter of law because Plaintiffs failed to procure a release for Defendants in the

12    settlement agreement.   "In general, in an action for common law indemnity, the

13    indemnity plaintiff must show, first, it has discharged a legal obligation owed to a third

14    party; second, the indemnity defendant was also liable to the third party; and third, as

15    between itself and defendant, the obligation should have been discharged by the

16    defendant."  *MT Builders, LLC v. Fisher Roofing, Inc.*, 197 P.3d 758, 764 n.2 (Ariz. Ct.

17    App. 2008) (citations omitted).   As is implicit in any equitable claim, the indemnity

18    plaintiff must be free of negligence.  *Evans Withycombe, Inc. v. W. Innovations, Inc.*, 159

19    P.3d 547, 551-52 (Ariz. Ct. App. 2006).

20    Because Plaintiffs are prosecuting the McGills' claims in this action, Defendants

21    argue that Plaintiffs cannot establish the first element of an equitable indemnity claim

22    because they did not "discharge [Defendants'] legal obligation" to the McGills.  Doc. 193

23    at 15 ( citing *MT Builders*, 197 P.3d at 764 n.2).  The Court disagrees for two reasons.

24    First, as the Court holds above, Plaintiffs' payment to the McGills did extinguish

25    any obligation Defendants had for breach of contract.   The payment amounted to an

26    accord and satisfaction.  Nor are Defendants subject to any continuing negligence claim.

27    Second, section 76 of the Restatement of Restitution, upon which Plaintiffs' claim

28    for equitable indemnification relies (Doc. 223 at 16), provides:

1
2
3

> A person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity from the other, unless the payor is barred by the wrongful nature of his conduct.

4
5   Restatement of Restitution § 76 (1937).  Comment (b) to this section explains that "if the

6   payor became liable without the consent or fault of the principal obligor, the latter's duty

7   of indemnity to the payor can be based only upon the ground that the payment is

8   beneficial to him."   In other words, Defendants' duty to indemnify Plaintiffs for

9   payments made to the McGills can arise in two circumstances: if Plaintiffs' payment was

10  beneficial to Defendants because it discharged Plaintiffs' liability to the McGills, or if

11  Plaintiffs' obligation to the McGills arises from "the consent or fault" of Defendants.  *See*

12  *Am. & Foreign Ins. Co. v. Allstate Ins. Co.*, 677 P.2d 1331, 1333 (Ariz. Ct. App. 1983)

13  (noting that a duty to indemnify can arise under comment (b) to § 76 "where the payor

14  becomes obligated to pay because of the consent or fault of the principal obligor").  Thus,

15  if Defendants' fault triggered Plaintiffs' duty to make a payment – as Plaintiffs claim in

16  this case – Plaintiffs could sue Defendants for recovery of the payment even if Plaintiffs

17  had not discharged a duty owed by Defendants.

18  ### c.   Agency Principles.

19         Plaintiffs argue that the anti-subrogation rule does not apply because their claim

20  for equitable indemnification "has nothing to do at all with the parties' insurer-insured

21  relationship, but instead is predicated upon [PCR's] status as Plaintiffs' agent."  Doc. 223

22  at 11.  They argue that "when a carrier is forced to pay a claim that is not covered under

23  its policy, a carrier is free to seek indemnification from a tortfeasor that caused the loss –

24  even if that tortfeasor happens to be an insured under an inapplicable policy."  *Id*. at 12

25  (citing *Truck Ins. Exch. v. Cnty. of Los Angeles*, 115 Cal.Rptr.2d 179 (Cal. Ct. App.

26  2002)).  Defendants respond that they are not Plaintiffs' agent.[3]  Doc. 224 at 8.

27

28         [3] Defendants also argue that the Court rejected Plaintiffs' assertion that an agency relationship existed when it granted Defendants' motion for leave to amend their answer. Doc. 244 at 3.  Defendants are incorrect.  The Court passed on deciding this issue at the

1    Arizona courts generally follow the Restatement of Agency.  *Fidelity & Deposit*
2  *Co. of Md. v. Bondwriter of Sw., Inc.*, 263 P.3d 633, 639 (Ariz. Ct. App. 2011).  The
3  Restatement defines "agency" as "a consensual and fiduciary relationship" that "creates a
4  [fiduciary] duty upon the agent to act in good faith and according to the terms of the
5  agency agreement."  *Maricopa P'ships, Inc. v. Petyak*, 790 P.2d 279, 281 (Ariz. Ct. App.
6  1989); *see* Restatement (Third) of Agency § 1.01 (2006) ("Agency is the fiduciary
7  relationship that arises when one person (a 'principal') manifests assent to another person
8  (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's
9  control, and the agent manifests assent or otherwise consents so to act.").

10    Plaintiffs have provided enough evidence for a reasonable fact finder to conclude
11  that an agency relationship existed between KnightBrook and PCR.  Plaintiffs have
12  presented evidence that KnightBrook issued the master policy to PCR and thereby
13  assented to PCR's sale of KnightBrook's insurance (Doc. 194-17 at 1-3), PCR could sell
14  SLI on KnightBrook's behalf and thereby bind KnightBrook to coverage (*id.*),
15  KnightBrook was able to exercise control over PCR by directing the sale of SLI under the
16  master policy (Doc. 233-3 at 101), and PCR manifested assent to the agency relationship
17  by selling SLI coverage on KnightBrook's behalf (Doc. 194-17 at 1-3).

18    Defendants argue that no agency relationship existed because PCR sold SLI for
19  "its own financial gain" and "not for KnightBrook's benefit, as would be required of a
20  principal-agent relationship[.]"  Doc. 244 at 6; *Salt River Valley Users' Ass'n v. Giglio*,
21  549 P.2d 162, 167 (Ariz. 1976) (en banc) ("Agency is a question of intent and generally
22  the agent must be acting under the control of the principal and for the principal's
23  benefit.").  This argument is unpersuasive.  Agents, like any rational actor, are guided by
24  their own self-interest – they become agents because the agency arrangement offers
25  benefits such as employment opportunities.  That fact does not prevent the creation of an
26  agency relationship.  If it could, any individual who sought employment primarily for

27
28  pleading stage, preferring to resolve it in the more complete factual setting of summary
   judgment. *See* Doc. 141 at 7.

1   personal gain would never be an agent.

2       Defendants also argue that no agency relationship existed because Plaintiffs could

3   not "control the activities of [PCR] in offering SLI as part of its car rental business."

4   Doc. 244 at 6.  KnightBrook's CEO testified, however, that KnightBrook had the ability

5   to exert control over PCR while the master policy was in place.  Doc. 233-3 at 101.

6   While Defendants argue that this testimony is incorrect, they offer no evidence

7   conclusively establishing that KnightBrook was unable to control the activities of PCR.[4]

8       The Court cannot conclude, as a matter of undisputed fact or as a matter of law,

9   that PCR was or was not KnightBrook's agent.  The parties have presented facts and

10  expert testimony on both sides of each element of the agency relationship.  The evidence

11  at trial may well persuade the fact finder that PCR was an agent.  While Plaintiffs may

12  not assert a claim for equitable indemnification against Defendants in their capacity as

13  Plaintiffs' insureds, it is possible that Plaintiffs may assert the claim against Defendants

14  in their capacity as Plaintiffs' agents.  The Court will not enter summary judgment for

15  Defendants on count five.

16              **4.      Breach of Fiduciary Duty.**

17       In count six, Plaintiffs assert a claim for breach of fiduciary duty.  Doc. 116,

18  ¶¶ 69-76.  To prevail on this claim, Plaintiffs must show that Defendants owed a

19  fiduciary duty, breached the duty, and damages resulted.  *John E. Shaffer Enters. v. City*

20  *of Yuma*, 904 P.2d 1252, 1256 (Ariz. Ct. App. 1995).  Plaintiffs allege that Defendants

21  breached their duties by telling Bovre that SLI was included in his rental agreement,

22  failing to review the rental agreement properly, using an inadequate rental contract,

23  failing to collect any premium for the SLI coverage that Bovre believed he had

24  purchased, and allowing Bovre to walk away from the rental counter believing that he

25  _____

26       [4] The only evidence adduced by Defendants at this stage is a statement by their
     expert, David Paige, who observed that "[t]hrough [his] years in the insurance industry,
27   [he has] never observed an 'agency' relationship between an insurer and an 'agent' that
     did not involve some kind of instruction, guidelines or training in the underwriting
28   process."  Doc. 244-7 at 9.  While this evidence tends to rebut the statement made by
     KnightBrook's CEO, it is by no means dispositive.

had received SLI coverage.  *Id.*, ¶ 73.  Plaintiffs allege that, as a proximate result of Defendants' failure to discharge their duties properly, Plaintiffs were forced to hire an attorney to respond to Bovre's claim and ultimately paid $970,000 to settle the claim. *Id.*, ¶ 75-76.

Defendants argue that Plaintiffs' breach of fiduciary duty claim fails as a matter of law for two reasons: (1) the claim is precluded by Arizona's anti-subrogation rule, and (2) the claim is barred by the statute of limitations.  Doc. 193 at 13, 16.  For the reasons set forth above, the Court concludes that Arizona's anti-subrogation rule does not bar Plaintiffs' claim for breach of fiduciary duty asserted against Defendants in their capacity as Plaintiffs' agents.  Because the Court cannot conclude that Defendants were not Plaintiffs' agents, the Court cannot dismiss the claim under the anti-subrogation rule.

The Arizona statute of limitations is two years for breach of fiduciary duty.  *Crook v. Anderson*, 565 P.2d 908, 909 (Ariz. Ct. App. 1977); A.R.S. § 12-542(3).  As explained above, a tort claim accrues when a plaintiff knows or "with reasonable diligence should know" of the defendant's wrongful conduct.  *Doe*, 955 P.2d at 960.  Defendants allege that the breach of fiduciary duty claim accrued on July 1, 2010, when Plaintiffs denied Bovre had purchased SLI and therefore knew or should have known of Defendants' alleged negligence.  Doc. 193 at 17.  Defendants assert that the claim accrued, at the very latest, on August 26, 2010, when attorney Collins wrote a letter to KMIS explaining the basis for Bovre's claim to SLI.  *Id.*; Doc. 194-12.  Because the claim was not brought against Defendants until June 14, 2013, Defendants argue it is time-barred.

Plaintiffs respond that the claim did not accrue until they had knowledge that a "wrong occurred and caused injury."  Doc. 223 at 17; *Callaway*, 246 P.3d at 941. Plaintiffs assert that they had no knowledge that a wrong occurred until January 13, 2013, the date of Fisher's deposition, when they learned that "Defendants' version of the transaction [with Bovre] could not be corroborated."  Doc. 223 at 18.  Because Plaintiffs "had no reason to question Defendants' version of the facts until Fisher's . . . deposition," they argue that they had no knowledge that a wrong occurred until the deposition.

1   Plaintiffs further assert that Fisher's conduct did not cause them injury until August 21,

2   2012, when they received their first bill from their attorneys in this litigation.  *Id.* at 19.

3       In Arizona, accrual of a claim "requires not only [wrongdoing] but damage."

4   *Myers v. Wood*, 850 P.2d 672, 673 (Ariz. 1992).  When deciding the accrual date of a

5   negligence claim, the Arizona Supreme Court has explained that "the limitations period

6   does not commence until actionable negligence exists, that is, negligence that results in

7   appreciable, non-speculative harm."  *Commercial Union Ins. Co. v. Lewis & Roca*, 902

8   P.2d 1354, 1358 (Ariz. 1995).  It is clear from the record that Plaintiffs had notice of

9   Fisher's alleged breach of fiduciary duty in the summer of 2010 when they learned that

10  Fisher failed to complete the rental agreement properly, that no premium had been

11  collected for SLI coverage, that a serious accident had been caused by Bovre and had

12  resulted in severe injuries to the McGills, and that Bovre was asserting that he in fact was

13  entitled to SLI coverage.  Doc. 224-2, ¶¶ 7-8.  It is not clear from the record, however, at

14  what point Fisher's actions resulted in "appreciable, non-speculative harm" to Plaintiffs.

15  Defendants, who have the burden of showing as a matter of undisputed fact that

16  Plaintiffs' claim is time-barred, do not address this issue in their brief.[5]  Because the

17  Court cannot determine as a matter of undisputed fact that Plaintiffs suffered appreciable,

18  non-speculative injury more than two years before they asserted their claim for breach of

19  fiduciary duty, the Court cannot enter summary judgment for Defendants on this claim.

20      In their own motion for summary judge, Plaintiffs argue that they are entitled to

21  summary judgment on their breach of fiduciary duty claim against Defendants.  Doc. 232

22  at 13.  But Plaintiffs' claim relies on the alleged principal-agent relationship, an issue of

23  fact that must be resolved at trial.  The Court therefore cannot enter summary judgment

24

25

26  [5] Defendants do argue that their actions caused no harm to Plaintiffs.  Doc. 244 at
    19.  If Fisher had noticed that the SLI coverage section was not initialed, they contend,
27  Bovre may well have purchased SLI coverage and Plaintiffs would be in the same
    position they are now.  But it is also possible that Bovre would have initialed and
28  declined coverage, eliminating this entire SLI lawsuit.  Defendants also argue that
    Plaintiffs' payment to the McGills was entirely voluntary, but Plaintiffs claim that it was
    required by Defendants' fault – an issue to be decided at trial.

for Plaintiffs on their breach of fiduciary duty claim.

### 5. Bad Faith Counterclaim.

Defendants assert a counterclaim for bad faith against Plaintiffs.  Doc. 144 at 16, ¶¶ 22-26.  Defendants allege that Plaintiffs breached the covenant of good faith and fair dealing implied in every insurance contract, which requires an insurer to "play fairly with its policyholder" and to "refrain from taking any action that undermines the security for which the policyholder paid premiums."  *Id*., ¶ 23.  Defendants allege that Plaintiffs breached this covenant by negotiating a settlement with the McGills, attempting to extort a contribution to the settlement from PCR, threatening to assert claims for contribution and indemnification against PCR, attempting to leverage their policyholder by obtaining an assignment of the McGills' claims and then asserting those claims against PCR, violating the anti-subrogation rule, and violating A.R.S. § 20-461(A)(2), (3), (4) and (6).  *Id*., ¶ 24.

Plaintiffs seek summary judgment on Defendants' counterclaim because PCR failed to tender a claim to KnightBrook before asserting its counterclaim for bad faith.  Doc. 232 at 8-10.  Plaintiffs argue that "[i]t is well-settled Arizona law that a cause of action for bad faith cannot exist unless the insured has first submitted a claim to the insurance company."  *Id*. at 8.  The Court rejects this argument for the reasons articulated in its previous orders.  *See* Docs. 141, 153.  It is not settled Arizona law that an insured must tender a claim to its insurer before it can assert a bad faith claim.  To borrow Defendants' observation, "Plaintiffs' contrary argument despite clear Arizona law does not improve with repetition."  Doc. 244 at 12.

Plaintiffs also argue that PCR was KnightBrook's agent not its insured.  Doc. 232 at 6-7.  As demonstrated above, Plaintiffs' argument that PCR was not insured under the master policy is meritless – PCR paid premiums to KnightBrook under a formula prescribed in the master policy and was repeatedly referred to as NAMED INSURED by the policy.  Arguing in the same vein, Plaintiffs assert that they are entitled to summary judgment because the SLI policy issued by KnightBrook and sold to renters by PCR

1    "would never have covered claims against [PCR] arising out of its errors and omissions

2    as an insurance agent."  Doc. 232 at 11.  This argument is also unconvincing.  Arizona

3    courts have held that a lack of coverage for a particular loss does not "preclude any bad

4    faith claims unrelated to coverage," and that a contractual breach or policy coverage is

5    not a prerequisite for bad faith claims.  *See, e.g.*, *Manterola v. Farmers Ins. Exch.*, 30

6    P.3d 639, 646 (Ariz. Ct. App. 2001); *see also Lozier v. Auto Owners Ins. Co.*, 951 F.2d

7    251, 255 (9th Cir. 1992) (concluding that under Arizona law an insurer who engages in

8    "a pattern of self-interested behavior" may be liable for bad faith even when its conduct

9    is separate from the coverage determination).

10        Plaintiffs also contend that PCR Venture has not suffered any damages.  Doc. 232

11   at 12 (citing *Walter v. Simmons*, 818 P.2d 214, 221 (Ariz. Ct. App. 1991)).  In *Walter*, the

12   plaintiff presented evidence of consequential damages to a jury, but failed to provide any

13   evidence from which a jury could reasonably compute the amount of damages.  *Walter*,

14   818 P.2d at 221.  The jury nonetheless returned a verdict awarding damages to the

15   plaintiff.  In affirming the trial court's decision to order a remittitur, the Arizona Court of

16   Appeals explained that the plaintiff failed to present any evidence that would have

17   enabled the jury to make an "approximately accurate estimate" of the damages.  *Id.*

18   (citation omitted).  *Walter* does not provide any support for Plaintiffs' motion for

19   summary relief.  Defendants assert that they have suffered damages in the form of

20   continued exposure to the $8 million *Damron* judgment via the Bovre-assigned claims

21   and in the form of legal fees as a result of Plaintiffs' bad faith.  Doc. 244 at 14.  Although

22   Plaintiffs have presented evidence that Great American has been paying for Defendants'

23   defense fees and costs throughout this litigation, they assert in the same breath that

24   Defendants are still on the hook for $970,000 and that Great American has sought a

25   declaration that it may stop defending Defendants.  Doc. 248 at 11-12.  In light of these

26   facts and assertions, the Court cannot conclude as a matter of law that Defendants have

27   suffered no damages.

28        Plaintiffs also contend that they are asserting claims against Defendants in their

1    capacity as Defendants' principal and not as Defendants' insurer.  While Arizona law
2    does not clearly permit Plaintiffs acting in their capacity as Defendants' principal to
3    assert claims against Defendants that they could not assert in the insurance context, it
4    does not clearly foreclose this possibility.  As explained above, however, the existence of
5    an agency relationship is a question of fact for trial and cannot provide the basis for
6    summary judgment in this case.

7    **II.    Plaintiffs' Motion for Negative Inference.**

8          **A.    Background.**

9          The Court held a discovery conference call on February 26, 2014 regarding
10   whether Defendants would be required to produce Rule 30(b)(6) witnesses able to testify
11   about training of desk agents or drafting of rental contracts.  Doc. 181.  Because of audio
12   problems, the conference call was held off the record.  During the conference call,
13   Defendants asserted that, due to their acquisition by a third party, they no longer had
14   access to witnesses able to testify about the requested topics.  The Court proposed that the
15   parties work out a binding affidavit stating that Defendants have no witness who can
16   testify about training of desk agents or drafting on the rental contract.  *Id.*  The parties
17   were amenable to this proposition and the Court entered an order consistent with the
18   parties' agreement.  *Id.*

19         **B.    Legal Standard.**

20         "A federal trial court has the inherent discretionary power to make appropriate
21   evidentiary rulings in response to the destruction or spoliation of relevant evidence."
22   *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993).  This power includes the power
23   to sanction the responsible party by adopting an inference that the spoiled or destroyed
24   evidence would have been unfavorable to the responsible party.  *Id.*; *Akiona v. United*
25   *States*, 938 F.2d 158, 161 (9th Cir. 1991).  When relevant evidence is lost accidentally or
26   for an innocent reason, an adverse evidentiary inference may be rejected.  *See Med. Lab.*
27   *Mgmt. Consultants v. Am. Broad. Cos., Inc.*, 306 F.3d 806, 823-24 (9th Cir. 2002)
28   (finding that district court properly declined to allow a negative inference because there

1    was no showing of bad faith).

2          **C.    Analysis.**

3          Defendants argue that the Court determined during the discovery conference call

4    that the 30(b)(6) depositions would not go forward because the information sought by

5    Plaintiffs was subject to the attorney-client privilege.  Doc. 238 at 3-4.  This argument is

6    incorrect.  The Court's order did not excuse Defendants' failure to produce Rule 30(b)(6)

7    witnesses.  Instead, the purpose of the order was to create a record that Defendants lacked

8    witnesses who were capable of providing non-privileged testimony regarding the

9    requested 30(b)(6) topics.  The Court's order accomplished this purpose by directing the

10   parties to collaborate and work out the terms of an acceptable affidavit.  The order did not

11   remove the consequences of Defendants' failure to provide the requested witnesses and

12   does not impede Plaintiffs from seeking an adverse inference.  In addition, who is to

13   blame for the parties' inability to work out the terms of an acceptable affidavit is not

14   relevant to Plaintiffs' motion for a negative inference.

15         Plaintiffs assert that the Court may adopt an adverse inference "because the

16   testimony requested was exclusively in the control of Defendants and Defendants have

17   failed to produce a corporate representative," which gives rise to an adverse inference.

18   Doc. 227 at 7; *UAW v. NLRB*, 459 F.2d 1329, 1339 (D.C. Cir. 1972) ("[W]hen a party

19   has relevant evidence within his control which he fails to produce, that failure gives rise

20   to an inference that the evidence is unfavorable to him.").

21         The Court will deny Plaintiffs' motion.  Plaintiffs have made no showing of bad

22   faith or other culpable conduct on the part of Defendants.  In addition, Plaintiffs have not

23   shown that the requested information was truly lost.  They could have deposed witnesses

24   from third party entities such as Khoury Consulting and LaPlaca Law Firm who had

25   knowledge of Defendants' training and contract formation, but chose not to do so.

26   **III.    Defendants' Motion for Jury Trial.**

27         Defendants move for a jury trial pursuant to Rule 39(b).  Doc. 256.  Defendants

28   assert that the docket in this case erroneously states "Jury Demand: Plaintiff," which they

relied on in good faith and therefore did not waive their fundamental right to a jury trial. Doc. 256 at 2; *see Aetna Ins. Co. v. Kennedy ex. rel. Bogash*, 301 U.S. 389, 393 (1937) ("[A]s the right to jury trial is fundamental, courts indulge every reasonable presumption against waiver.").

Under Rule 38, a party waives its right to a jury trial unless it properly serves and files a demand for a jury trial no later than 14 days after the last pleading directed to a particular issue. Fed. R. Civ. P. 38(b) & (d). The Court is to "indulge every reasonable presumption against waiver" of the jury trial right, and therefore "accept jury demands that fall far short of the ideal." *Lutz v. Glendale Union High Sch.*, 403 F.3d 1061, 1064 (9th Cir. 2005) (citations omitted). The jury demand, however, must be "sufficiently clear to alert a careful reader that a jury trial is requested on an issue" and "inform the Court and counsel well in advance of trial as to the trial method desired." *Id*. (citations omitted).

No party has served or filed a demand for a jury trial in this case. Defendants do not contend otherwise. Because "[a] party waives a jury trial unless its demand is properly served and filed," Fed. R. Civ. P. 38(b), the right to a jury trial has been waived in this case.

Defendants rely on the presumption against unintended waivers of the right to jury trial. *See Mondor v. U.S. Dist. Court for Cent. Dist. of California*, 910 F.2d 585, 587 (9th Cir. 1990). Such a presumption cannot control in this case, however, because Defendants expressly confirmed that they were not demanding a jury trial. On September 26, 2012, the parties filed a Joint Case Management Report, signed by Defendants' counsel, which stated that "[a]lthough no jury trial has been requested, the plaintiffs anticipate requesting one if the case is not remanded." Doc. 30, ¶ 16. This statement not only confirmed Defendants' understanding that no jury trial had been requested, it also asserted that only Plaintiffs' counsel would be seeking one (Plaintiffs at the time were the McGills). Defendants do not contend that the McGills ever made such a demand before settling their claims and exiting this case.

Given the clear waiver of a jury trial under Rule 38(d), the Court must decide whether to grant Defendants' request under Rule 39(b).  The Ninth Circuit has instructed that "the district court's discretion under Rule 39(b) is narrow and does not permit a court to grant relief when the failure to make a timely demand results from an oversight or inadvertence such as a good faith mistake of law with respect to the deadline for demanding a jury trial."  *Zivkovic v. S. California Edison Co.*, 302 F.3d 1080, 1086 (9th Cir. 2002) (quotation marks and citation omitted).  Defendants argue that they relied in good faith on the Court's docket, which states at the top: "Jury Demand: Plaintiff."

As noted above, however, Defendants specifically stated in the Joint Case Management Report that no jury trial had been demanded, and they gave no indication that they intended to demand one.  In addition, when defense counsel deposed Plaintiffs' expert, Thomas Zlaket, some 17 months later on March 4, 2013, he asked Mr. Zlaket how his opinion differed from that of an attorney in the litigation.  Mr. Zlaket gave this response:

> Look, it may well be that the judge – and by the way, you've – when we took a break and you said this was not a jury trial this is a court trial, I may have thought that this was a jury trial.
> The question of how far the judge is going to allow any expert to go with the trial of this case depends on the judge.

Doc. 257-1 at 5.  Defense counsel responded: "I understand."  *Id.* at 6.

The Court concludes that Defendants knew a jury trial had not been demanded in this case.  No pleading made such a demand, and counsel confirmed this fact in the Joint Case Management Report.  Doc. 30, ¶ 16.  Counsel also made no objection when this fact was stated again in Mr. Zlaket's deposition.  Given these facts, the Court cannot conclude that the entry in the Court's docket somehow misled defense counsel.

Counsel's failure to demand a jury trial thus appears to have been the result of oversight or inadvertence.  The Ninth Circuit has made clear that this is not a sufficient basis for granting a Rule 39(b) motion.  *Zivkovic*, 302 F.3d at 1086.  In its discretion, the Court will deny Defendants' motion under Rule 39(b).

**IV.     Motion in Limine.**

The Payless entities have moved to exclude the testimony of the Knight entities' expert, Thomas Zlaket.  Doc. 242.  The Payless entities argue that Zlaket's testimony should be excluded for two reasons: (1) he does not have a reliable basis of knowledge and experience in the insurance field to qualify as an expert, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993) (explaining that part of the analysis performed by courts to ensure the reliability and relevancy of experts includes determining whether the "expert's opinion [has] a reliable basis in the knowledge and experience of his discipline"); and (2) his report is not helpful to the Court because it merely consists of legal conclusions, *Nationwide Transport Finance v. Cass Information Systems, Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) ("[A]n expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law.") (emphasis in original).  *Id*. at 2-3.

The Court will deny the motion.  Such a motion in a bench trial is unnecessary because the Court is not in danger of being swayed by the aura of the expert's testimony and certainly will be able to distinguish between proper expert opinion and mere legal conclusions.  *See United States v. Li*, No. CV12-00482-PHX-DGC, 2013 WL 6244657, at * 3 (D. Ariz. Dec. 3, 2013); *see United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009) ("The need for in limine motions was moot once it was clear that Heller had waived his right to a jury trial.").  The Court also notes that the Payless entities relied on portions of Zlaket's expert report in their motion for summary judgment.  *See, e.g.*, Doc. 193 at 10 n.8; Doc. 194, ¶ 3.

**IT IS ORDERED**:

1.     Defendants' motion in limine (Doc. 242) is **denied**.

2.     Defendants' motion for summary judgment (Doc. 193) is **granted in part** and **denied in part** as set forth above.

3.     Plaintiffs' motion for summary judgment (Doc. 232) is **denied**.

4.    Plaintiffs' motion that the Court adopt negative inferences (Doc. 227) is **denied**.

5.    Defendants' motion for jury trial (Doc. 256) is **denied**.

6.    Defendants'motion for leave to file surreply (Doc. 253) is **denied**.

7.    The Court will set a final pretrial conference by separate order.

Dated this 3rd day of September, 2014.

_____
David G. Campbell
United States District Judge